## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA    )
)
        v.    )
)        **Criminal Case No. 06-101 (GK)**
HAROL RODRIGO SUAREZ-GARCIA, )
)
NESTOR DARIO CASTRO,    )
)
        Defendants.    )

## GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION TO DISCLOSE IDENTITIES OF CONFIDENTIAL SOURCE (CS) AND GOVERNMENT WITNESSES[1] AND GOVERNMENT'S MOTION FOR THE CS TO TESTIFY UNDER PSEUDONYM

**COMES NOW** the United States of America, by and through the undersigned attorney, and hereby files its opposition to defendant's motion to disclose the identities of the confidential source ("CS") and government witnesses, and its motion for the CS to testify under a pseudonym. In support thereof, the United States hereby states the following:

### INTRODUCTION

The Defendants have filed this motion claiming that they are entitled to the disclosure of information concerning the identities of each confidential source/informant ("CS") and government witness regardless of whether they will testify at trial. The defendants mistakenly claim that "[t]hese witnesses provided information to law enforcement after they were either charged or told that they would be indicted unless they agreed to cooperate." Def. Mot. at 1. The defendants argue, furthermore, that disclosure is particularly important where the government chooses not to call a CS. Def. Motion at 3. The defendants' motion appears to be moot. As

---

[1]This motion was originally filed by defendant Nestor Dario Castro, but was later joined by co-defendant Harol Rodrigo Suarez-Garcia.

reflected in the discovery, there is only one CS in this case, who will testify at trial. Furthermore, the CS never faced the possibility of being charged with anything, because he was not being investigated for any crime at the time he began cooperating with DEA in the present case. Besides the CS, the only other witnesses in the case are the government's expert witness, DEA agents, and foreign law enforcement officers serving in an undercover capacity (UC's). The government will provide the required notice of expert testimony six weeks prior to trial, and will provide a witness list with the real names of all of its witnesses, including the CS, immediately upon the swearing of the jury. However, the government requests from the Court permission for the CS to testify under a pseudonym to protect his true identity from public disclosure.

As to the defendants' request for the disclosure of the CS's identity, the defendants have no right to the early disclosure of that information. Rather, the Government enjoys the "time-honored privilege to withhold the identity of its informants from criminal defendants." See United States v. Brodie, 871 F.2d 125, 128 (D.C. Cir. 1989). The onus, moreover, is on the defendants to establish that at this time the disclosure of the CS's identity is necessary and relevant to their defense. United States v. Warren, 42 F.3d 647, 654 (D.C. Cir. 1994). The defendants, however, fail to make any such showing. That notwithstanding, the Government's principal objection to the defendants' request is that, if granted, the CS's life would be placed in danger. Indeed, the Government has reason to believe that both the safety of the CS and of the CS's family would be in jeopardy if the CS's name were disclosed at this time. As such, the Government submits that an early disclosure would be wholly inappropriate. Accordingly, the Government respectfully requests that this Court: (1) permit the Government to postpone disclosure of the CS's identity until one week before trial, and (2) permit the CS to testify using a

pseudonym instead of his/her given name.

## ARGUMENT

### I.     The Government Is Not Required to Disclose The Identity of The CS at This Time

For a myriad of reasons, the defendants assert that their "due process rights mandate pretrial disclosure of the identities of each CS who has provided information to law enforcement" and that "there is no reason related to security to withhold this essential information." Def. Mot. at 2.  That is incorrect.  In point of fact, the defendants have no right to compel the early disclosure of a CS's identity.  See United States v. Jones, 612 F.2d 453, 454-55 (9th Cir. 1980) (the defense has no right to pre-trial discovery of information regarding informants or government witnesses, to include their identity, except as allowed by Jenks Act.)  Id.

The Government possesses the privilege "to withhold from disclosure the identity of persons who furnish information of violations of law."  Rovario v. United States, 353 U.S. 53, 59 (1957).  The purpose of that privilege "is the furtherance and protection of the public interest in effective law enforcement."  Id.[2]  In the context of narcotics case, moreover, "the privilege of the Government to withhold the identity of informers is especially important."  United States v. Lloyd, 400 F.2d 414, 415 (6th Cir. 1968) ("the transaction is always consensual; only the pusher and the buyer are involved.  The Government must of necessity rely on informers, and an informer is effective only so long as his identity is not known.")  Id.

In this case there is only one CS.  Furthermore, the Government will disclose the identity

---

[2]That privilege is qualified, however.  Indeed, in the event that "disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense  of an accused, or is essential to a fair determination of a cause, the privilege must give way."  Id. at 60-61.

of that CS immediately upon the swearing of the jury. The Government has already turned over all *Jencks* in its possession that can fairly be considered "statements"by the CS. Any additional *Jencks* that the Government discovers will be turned over at or before the time the CS' true identity is revealed. This will provide the defense with more than an adequate amount of time in which to prepare their cross-examination of the CS. For all of these reasons, defendants' claim that they are entitled to the early disclosure of the CS's identity is without merit and should be denied.

II.    **Defendants' Association with The AUC Justifies The CS' Use of a Pseudonym in This Trial**

There is precedent to support the Government's assertion that this Court should permit the CS to testify using a pseudonym. In fact, there have been two recent cases in which judges in this jurisdiction have permitted Government witnesses to testify using pseudonyms because of the defendant's membership in a violent narcotics trafficking organization. For example, in the case of United States v. Juvenal Ovidia Ricardo Palmero Pineda a/k/a "Simon Trinidad", (Crm. No. 02-112-12), Judge Royce Lamberth permitted several Government witnesses to testify using pseudonyms. Trinidad was a member of the Fuerzas Armadas Revolucinarias de Colombia ("FARC"), a designated foreign terrorist organization ("FTO"). Similarly, in the case of United States v. Anayibe Rojas Valderama a/k/a "Sonia", (Crm. No. 03-554-2,3.4), a trial against a FARC member and two FARC associates, Judge James Robertson permitted various Government witnesses to testify using pseudonyms. This case presents analogous circumstances. Indeed, during the course of the conspiracy in this case the defendants represented themselves to be members and/or associates of Colombia's largest and most powerful right wing paramilitary

4

organization, the United Self-Defense Forces of Colombia ("AUC"), which is too a FTO, based

on its record of brutal retribution against those that interfere with its criminal activities. The

AUC's record of summary executions, massacres, and killings of both private citizens and public

servants is well known and warrants the need for added protection to the CS in the present case.

The AUC's history is fraught with violence. For example, in 2006, Human Rights Watch

reported that the Colombian Prosecutor General's Office had confiscated a computer owned by

an associate of the AUC leader known as "Jorge 40", which contained evidence of over 500

assassinations committed by the AUC in just one Colombian state between 2003 and 2005.

Human Rights Watch, World Report 2007: events of 2006, Colombia, 181. Similarly, in last

year's Country Report on Human Rights Practices, the State Department reported that

"Paramilitary members who refused to demobilize and new illegal groups killed journalists, local

politicians, human rights activists, indigenous leaders, labor leaders, and others who threatened

to interfere with their criminal activities, showed leftist sympathies, or were suspected of

collaboration with the FARC. They also reportedly committed massacres and "social cleansing"

killings of prostitutes, homosexuals, drug users, vagrants, and gang members in city

neighborhoods they controlled." Colombia, Country Report on Human Rights Practices, Bureau

of Democracy, Human Rights and Labor, 2007. The same Report discussed the indictment of

former AUC member Victor Manuel Mejia Munera for his role in the 2004 AUC massacre of 11

peasant farmers in Tame, Arauca. Id.

Likewise, the 2006 Country Report discussed two AUC massacres in 1997, including the

killing of 19 civilians in the La Granja and El Aro communities in Ituango, Antioquia

Department. Colombia, Country Report on Human Rights Practices, Bureau of Democracy,

5

Human Rights and Labor, 2006.  The same Report revealed a massacre by the AUC's Northern

Block in December 2005 in Curumani, Cesar Department.  Id.  Similarly, the 2005 Country

Report discussed the discovery of two mass graves on former AUC ranches in San Onofre, Sucre

Department containing 72 bodies, as well as the arbitrary detention, torture, and execution by the

AUC of 12 minors in Buenaventura, Valle de Cauca Department.  Colombia, Country Report

Human Rights Practices, Bureau of Democracy, Human Rights and Practices, Bureau of

Democracy, Human Rights and Labor, 2005.  The same Report discussed the murder of between

8 and 22 people by members of the AUC's Northern Bloc in town of Curumani in Cesar

Department.  Id.

Individuals who investigate or speak out about the AUC are routinely executed.  For

example, paramilitaries killed two narcotics officers searching for an AUC drug laboratory in

2003.  Colombia, Country Report Human Rights Practices, Bureau of Democracy, Human Rights

and Labor, 2003.  The 2003 Report revealed that AUC leader Carlos Castano was implicated in

the 2001 murder of former Cucuta regional ombudsman Ivan Villamizar, as well as the 1999

murder of prominent journalist Jaime Garzon.  The Report also detailed the paramilitary

assassination of Norte de Santander gubernatorial candidate and former National Peace Council

member Tirso Velez.  Id.

In its 2005 Report, the State Department reported that the AUC detained, tortured, and

sexually abused Yeni Zurley Toro Bonilla, the local coordinator for the NGO Fundepaz in

Charco, Narino Department; that nine members of the AUC were arrested for the assassination of

Orlando Benitez Palencia, a local official in Cordoba Department, and two others; and that that

four members of the AUC abducted businessman Mauricio Ernesto Vives Lacouture, brother of

6

Senator Luis Vives Lacouture. Colombia, Country Report Human Rights Practices, Bureau of Democracy, Human Rights and Labor, 2005.

The 2007 Report revealed that AUC leader Salvatore Mancuso and two other paramilitary members were convicted for the 2001 murder of USO President Sarah Marrugo, and that demobilized AUC paramilitaries had allegedly tortured and killed Uriel Henao, a farmer in La Dorado, Caldas. Colombia, Country Report Human Rights Practices, Bureau of Democracy, Human Rights and Labor, 2007. The 2007 and 2006 Reports revealed that one AUC member was found guilty, and five additional AUC members had been arrested for the murder of Afro-Colombian leader Orlando Valencia in 2005. Colombia, Country Report Human Rights Practices, Bureau of Democracy, Human Rights and Labor 2006 and 2007.

The 2006 Report discussed the indictment of AUC leaders Ernesto Baez and Rodrigo Perez for ordering the 2001 killing of lawyer and human rights activist Alma Rosa Jaramillo Lafourie in Bolivar Department; the AUC killing of Evangelical pastor Oscar Munoz Perea in Buenaventura, Valle de Cauca Department; and the capture of three AUC members for the killing of journalist Gustavo Rojas. Colombia, Country Report Human Rights Practices, Bureau of Democracy, Human Rights and Labor, 2006.

Human Rights Watch reported that Yolanda Izquierdo, a mother of five who in 2006-2007 had led a group of 700 paramilitary victims demanding the return of stolen land, was shot to death, notwithstanding her request government protection. Human Rights Watch, World Report 2008: Events of 2007, Colombia, p. 202. Human Rights Watch also reported the arrest of paramilitary commander, Diego Murillo Bejarano (also known as "Don Berna" or "Adolfo Paz"),

for allegedly ordering the assassination of a local congressman.  Human Rights Watch, World

Report 2008: Events of 2007, Colombia, p. 202.

### A.    The CS Has Been Targeted And Shot in The Past Because of His/Her Cooperation with Law Enforcement

In February of 2001, the CS and an associate were shot in Central America.  A

subsequent investigation revealed that the attack was retaliatory.  In fact, the CS was targeted

because of his/ her cooperation with the DEA in regard to various narcotics trafficking

investigations.  Shortly thereafter, the DEA assisted the CS in relocating to El Salvador for

his/her protection.  In June of 2001, the CS fled to the United States, and has been here ever

since.  The CS has provided assistance to the DEA Las Vegas District Office (LVDO) since

October of 2001. Because of this incident in which the CS was nearly killed, the Government's

concerns regarding the CS's safety are clearly warranted.  As such, the Government hereby

moves this Court to permit the CS to testify under a pseudonym so that no public disclosure of

the CS's true identity is made.

### B.    Public Disclosure of Witness Identities Not Required to Preserve Defendant's Confrontation Clause Rights.

The fact that the Government intends to disclose the identity of the CS, as well as any

*Brady*, *Giglio* (including compensation and offers of inducement) and additional *Jencks* on the

CS immediately upon the swearing of the jury, essentially vitiates any Confrontation Clause

issues in this case.  That notwithstanding, here it may nevertheless be appropriate to provide a

brief sketch of the relevant case law dealing with the balance that this Court must consider when

assessing the Government's right to preserve and protect the anonymity of its CS and the

defendants' right to confront and cross-examine the Government's witnesses.

8

Alford v. United States, 282 U.S. 687 (1931) and Smith v. Illinois, 390 U.S. 129 (1968) require as a constitutional minimum that a defendant be given an opportunity "to place the prosecution's witness in their proper setting and to test the weight of their testimony and their credibility before the jury." In dicta, the majority in Smith suggested that a demonstrated risk to the safety of a witness could, in an appropriate case, justify some curtailment of the accused's right to a full disclosure of the witness' identity. 390 U.S. 129, 133-134 (White J., joined by Marshall J., concurring). Relying on Smith, courts have found that the confrontation rights of the accused are not absolute and should yield where the prosecution proves that the threat to the witness is "actual and not the result of conjecture." See United States v. Palermo, 410 F.2d 468, 472 (7th Cir. 1969).

The Confrontation Clause arose in response to the legal abuses that occurred in criminal trials in England prior to the seventeenth century. Its primary purpose was to prevent the trial of individuals based solely on accusations made anonymously or by the use of *ex parte* depositions or affidavits. See White v. Illinois, 502 U.S. 346, 362 (1992). The purpose of the Confrontation Clause was to provide specific trial procedures to promote the reliability and the integrity of evidence presented in criminal trial. Id. at 356-57. This is accomplished by providing certain rights to the accused, including the right to cross-examine and physically confront one's accusers. The Clause also affords to the accused various layers of protection: that trials be set in a court of law; that the accused and the prosecution witnesses be present before the trier of fact; that the trier of fact be able to observe the demeanor and assess the credibility of the witnesses as they testify; and that witnesses give their statements under oath, subject to the penalty of perjury. Maryland v. Craig, 497 U.S. 836 at 845-46 (1990).

9

The Confrontation Clause was meant to protect against the use of anonymous accusers, individuals who signed declarations, did not attend trial, did not swear to the truth of their statements, and did not face the trier of fact or the defendant. California v. Green, 399 U.S. 149, 156 (1970). Here, preventing early public disclosure of the CS's given name does no harm to the rights guaranteed by the Confrontation Clause. The defense attorneys and the defendants will be told the true name of the CS, providing the defense team with adequate means to prepare a defense. The defendant will have the opportunity to confront physically and cross-examine the witnesses against him, and the trier of fact will have a full opportunity to assess the demeanor and credibility of the CS. In addition, the CS would give his/her testimony under oath, subject to the penalty of perjury. Hence, there will be no meaningful curtailment of Confrontation Clause rights.

In any event, the rights under the Confrontation Clause may be forfeited, waived, or limited by the trial court, just as with any other constitutional right. See Peretz v. United States, 501 U.S. 923, 936 (1991) ("The most basic rights of criminal defendants are...subject to waiver"). The privilege may be lost by consent, by express or implied waiver, by conduct, or by misconduct. Diaz v. United States, 223 U.S. 442, 450 (1912). Additionally, the confrontation rights of the accused are also limited by recognized hearsay exceptions. Because the fundamental aim of the Confrontation Clause is to promote the integrity of the fact-finding process, exceptions under the hearsay rules, when they are firmly rooted and have sufficient indicia of reliability, do not violate that right. See White v. Illinois, 502 U.S. 346, 355 & n.8 (1992). Most importantly, the trial court is permitted to place reasonable limitations on the bounds of cross-examination without violating the Sixth Amendment. Delaware v. Van Arsdall,

10

475 U.S. 673, 679 (1986); see also Maryland v. Craig, 497 U.S. 836, 863 (1990) (Scalia, J., dissenting).

**C.    Witness Intimidation and Waiver by Misconduct**

Witness intimidation has a profound and serious impact on the ability of the government to enforce its laws and on society's confidence in the ability of government to protect its citizens. Peter Finn & Kerry Murphy Healey, U.S. Dep't of Justice, Preventing Gang-and-Drug-Related Witness Intimidation 1 (1996). When witness intimidation occurs and discourages a witness from testifying, it prevents the prosecution of crimes, allows those who are guilty of crimes to remain free and go unpunished, and frustrates law enforcement personnel and prosecutors. Id. 181, at vii. Furthermore, witness intimidation creates the perception that the law cannot protect its citizens and thereby undermines public confidence in the police and government. Id. at 2.

The doctrine of waiver by misconduct provides that if a defendant, through misconduct, has prevented a witness from appearing and testifying at his trial, then he has waived his right of confrontation as to that witness and hearsay evidence with respect to that witness' testimony is admissible. Reynolds v. United States, 98 U.S. 145, 158-59 (1878). The waiver doctrine was codified as a rule of evidence in 1997. See FED. R. EVID. 804, 1997 Amendment, Subdivision (b)(6) (listing cases). The Constitution grants the accused the privilege of being confronted with the witnesses against him. It does not insulate him against the legitimate consequences of his own wrongful acts; if he voluntarily keeps the witnesses away, he cannot insist on his privilege.

**D.    The Defendants' Membership in a Foreign Terrorist Organization with a Documented History of Killing its Opponents Justifies Limited Disclosure of Witness Identities**

Public policy, equity, and fairness demand that the waiver by misconduct doctrine should

11

be extended to allow nondisclosure of threatened witnesses' identities. <u>Maryland</u> v. <u>Craig</u>, 497

U.S. 836, 844-49 (1990); <u>Coy</u> v. <u>Iowa</u>, 487 U.S. 1012, 1020-21 (1988); <u>Ohio</u> v. <u>Roberts</u>, 448

U.S. 56, 62-65 (1980); <u>Chambers</u> v. <u>Mississippi</u>, 410 U.S. 284, 295 (1973) (Public policy

considerations may limit the scope of the right of confrontation.).  Federal Rule of Evidence

804(b)(6) codifies the doctrine of waiver by misconduct, recognizing the need for protective

measures to deal with abhorrent behavior "which strikes at the heart of the system of justice

itself." <u>United States</u> v. <u>Mastrengelo</u>, 693 F.2d 269, 273 (2d Cir. 1982).[1]

Additionally, when the government creates a special relationship with a person by placing

him in a vulnerable situation, the substantive component of the due process clause obligates the

government to provide for the person's basic needs and protection. <u>Wang</u> v. <u>Reno</u>, 81 F.3d 808,

818 (9th Cir. 1996).  After trial, the CS may be sent to Central America outside the protective

reach of our Government.  The AUC is recognized by the United States Department of State and

the European Union as a foreign terrorist organization.  The AUC finances itself through

kidnapping, extortion, and drug trafficking.  Many fronts of the AUC have overrun and

massacred small communities in order to silence and intimidate those who do not support their

activities.

The AUC is a violent organization with far reaching influence throughout Colombia and

Central America and early disclosure of the CS's true identity will all but guarantee violent

---

[1] For more extensive analysis advocating for extension of doctrine of waiver by
misconduct, see Judge Joan Comparet-Cassani, <u>Balancing the Anonymity of Threatened
Witnesses Versus a Defendant's Right of Confrontation: The Waiver Doctrine After Alvarado</u>,
39 San Diego L. Rev. 1165, 1223-39 (2002).

reprisals against the CS and the CS's family members  Because this threat of violence is very

real, and recognizing the government's obligations to take necessary protective action to ensure

the continued safety of the CS and of the CS's family, the doctrine of waiver by misconduct

should be extended to allow certain prosecution witnesses to testify under assumed names.

Furthermore, the CS is a Colombian but presently lives and works in the United States.

The CS sought to leave Central America where his safety was in grave danger.  The CS does not,

however, have permanent legal status in the United States.  Indeed, the CS may have to return to

Central America, where is family is currently residing, once his temporary status in this county

expires.  The defendants, too, have ties to Central America.  In fact, three of the defendants were

arrested in Central America and many of the events related to this case took place there.  In light

of these considerations, it is entirely appropriate and necessary for the CS to testify using a

pseudonym at trial.

### E.    Testimony under Assumed Names

Federal courts addressing this issue have ruled that, under appropriate circumstances

including safety concerns of witnesses and their families, government witnesses may testify using

pseudonyms.  In United States v. Ellis, 468 F.2d 638 (9th Cir. 1972), the Circuit Court affirmed

the District Court's refusal to allow the defendant to elicit the witness's correct name, residence,

and occupation, because of potential harm to the witness.  Similarly, in United States v. Fuentes,

988 F. Supp. 861 (E.D. Pa. 1977), the Court held that the Confrontation Clause does not require

an undercover narcotics agent's revelation of his true identity in open court, ruling that "not

permitting use of his true name during trial has [in our view] no constitutional significance."

(witness' use of pseudonym appropriate, provided defense has adequate opportunity for cross-

examination).  In <u>Clark</u> v. <u>Ricketts</u>, 958 F.2d 851, 855 (9 Cir. 1991) the Court ruled that there

was no Confrontation Clause violation in the witness' use of a pseudonym, because defendant

knew the witness' name before testifying and, therefore, had an opportunity to investigate and

conduct cross-examination.  See also <u>U.S.</u> v. <u>Rangel</u>, 534 F.2d 147, 148 (Ruling that trial court

properly refused to require informant to divulge his true name, home address, and phone number

on witness stand, where government made representation that informant's life had been

threatened, and evidence adduced at in camera hearing indicated that Government's

representations were not groundless).

**CONCLUSION**

**WHEREFORE**, for the foregoing reasons, the United States respectfully requests that

the Court deny defendants' motion for the early disclosure of the identities of each confidential

source/informant (CS) and government witness regardless of whether they will testify at trial, and

that the Court permit the CS to testify under a pseudonym after the government provides his real

identity to defense counsel, and that the Court order that his real identity remain under seal.

Respectfully submitted,

James A. Faulkner
Trial Attorney
U.S. Department of Justice
Narcotic and Dangerous Drug Section
1400 New York Avenue, NW # 8108
Washington, D.C. 20005
Telephone: (202)616-8648
Email: jim.faulkner@usdoj.gov

14

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading was delivered to all parties via ECF on this

date, June 1st, 2008.

_____

James A. Faulkner
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
(202) 616-8648
jim.faulkner@usdoj.gov

15